Steven J. Mirsky (SBN 297370)
**MIRSKY CORPORATE ADVISORS, APC**
901 Dove. St, Ste. 120
Newport Beach, CA 92660
(949) 200-6837
Email: smirsky@mirskycorporateadvisors.com.
*Attorney for Plaintiffs*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

SDLA COURIER SERVICE, INC., a California corporation; and JAMES GOODMAN, JR., an individual,

Plaintiffs.

v.

CITY CAPITAL NY LLC, a Connecticut company, d/b/a Gold Capital USA; CITY CAPITAL NY LLC, a New York limited liability company, d/b/a Gold Capital USA; MCA RECEIVABLES GROUP LLC, a Delaware limited liability company; ACE RECOVERY GROUP LLC, a New York limited liability company; JOSEF GOLD, an individual; ZACH GOLD, an individual; DANIEL GOLD and DOES 1-20.

Defendants.

Case No.:
Hon.

**VERIFIED COMPLAINT FOR**:

1. **RICO**, 18 U.S.C. §1962

2. **Conspiracy**, 18 U.S.C. § 1962(d)

3. **Usury**, Cal. Const. Art. XV, Sec. 1 and Cal. Civ. Code § 1916-3

4. **Usury**, Cal. Const. Art. XV, Sec. 1 and Cal. Civ. Code § 1916-3

5. **Unfair and Deceptive Acts and Practices**, Cal. Bus. & Prof. Code § 17200

6. **Intentional Interference with Contractual Relations**

7. **Breach of Contract**

8. **Breach of Implied Covenant of Good Faith & Fair Dealing**

9. **Fraudulent Misrepresentation**

**10. Unjust Enrichment**

## COMPLAINT

PLAINTIFFS SDLA COURIER SERVICE, INC. ("**SDLA**") and JAMES GOODMAN, JR ("**Goodman**") (collectively, "**Plaintiffs**"), by and through their undersigned attorney, bring this suit against DEFENDANTS CITY CAPITAL NY LLC, a New York limited liability company d/b/a Gold Capital USA ("**Gold NY**"), CITY CAPITAL NY LLC, a Connecticut limited liability company d/b/a Gold Capital USA ("**Gold CT**") (collectively, Gold NY and Gold CT are "**Gold**"), MCA RECEIVABLES GROUP, LLC, LLC, a Delaware limited liability company ("**MCA Receivables**"), Ace Recovery Group LLC, a New York limited liability company ("**Ace**")Josef Gold, an individual ("**Josef**"), Zach Goldas, an individual ("**Zach**"), and Daniel Gold ("**Daniel**") and DOES 1-20 (collectively, "**Defendants**") and hereby alleges as follows:

## INTRODUCTION

1. Plaintiff SDLA is a California business engaged in providing courier services for its only customer, Amazon Inc ("**Amazon**"). Prior to the events giving rise to this Complaint, SDLA was the nation's largest courier service provider for Amazon and employed hundreds of individuals. SDLA had operated profitably for nearly a decade and the prior owner sold his share of the business to the current owner of SDLA in a stock purchase agreement. As the second closing of the stock purchase agreement approached, SDLA sought to obtain financing to pay off the terms of the Seller's Note. SDLA, unfortunately, was denied funding by traditional lending sources due to alleged accounting errors and false representations the prior owner made in the stock purchase agreement.

2. SDLA reached out to a broker to help it obtain funding. The broker introduced SDLA to a business financing scheme known as "Merchant Cash Advance" or "MCA" financing.

3. The broker sent SDLA's financial information to a third party. This third party then sent SDLA's application far and wide. As a result, the officers of SDLA were hounded on a daily basis from Merchant Cash Advance lenders seeking to fund business loans.

4.   Based on the volume and the tenacity of the calls, SDLA relented and fell victim to a the predatory lending scheme and collection practices of the Defendants. As a result, in a period of less than a year, SDLA went from a profitable business to an insolvent enterprise as Defendants used strong-arm tactics, unconscionable contracts, and bad faith negotiations to cynically bait and switch SDLA, freeze SDLA's bank accounts and cause the termination of SDLA's contract with Amazon.

5.   SDLA's dramatic and rapid downfall was a direct result of concerted fraudulent and illegal lending practices of Defendants that California law defines as "loan sharking"[1]. Defendants and their affiliates are lending money at extremely high rates of interest, under unlawful conditions, and with draconian consequences for non-payment.

6.   In an effort to bypass California and federal laws, Defendants have been operating in concert with each other to engage in so-called "Merchant Cash Advance" transactions, which are carefully disguised predatory loans.  By avoiding the words "loan" and "interest" in their contracts with SDLA and by invoking favorable procedural laws in foreign states that have nothing to do with the commercial terms of the transaction or the borrower, Defendants intentionally sought to evade legal requirements for conducting business in the State of California and with California businesses. As a result, the transactions between SDLA and Defendants failed to comply with the California's Constitutional prohibitions on usurious loans, a California lender's license required by California Financial Code §§ 22000, *et seq*., and failure to comply with numerous other laws, including Cal. Corp. Code §§ 2105, 2203, Cal. Fin. Code § 22800, *et al.* and Cal. Rev. & Tax. Code § 23304.1.

7.   Defendant Gold made at least one (1) usurious loan to SDLA and guaranteed by Plaintiff Goodman, one of which is at issue in this Complaint (the "**MCA Agreement**"). Upon

---

[1] Cal. Civ. Code § 1916-3 ((b) Any person who willfully makes or negotiates, for himself or another, a loan of money, credit, goods, or things in action, and who directly or indirectly charges, contracts for, or receives with respect to any such loan any interest or charge of any nature, the value of which is in excess of that allowed by law, is guilty of **loan-sharking**, a felony, and is punishable by imprisonment in the state prison for not more than five years or in the county jail for not more than one year.")

information and belief, Gold provided SDLA with a sum of money equal to $450,000 in exchange for an absolute obligation to repay Gold $749,500 over a term of 93 days, the equivalent of a 311% loan. It is against this background that Plaintiffs file this Complaint.

8. Defendants, all affiliated with Gold, collectively operate as a classic predatory lender, whose unlawful and fraudulent business practices, coupled with unlawful collection tactics destroy California businesses while unjustly enriching themselves.

9. Pursuant to the "Purchase and Sale of Future Receivables", i.e. the MCA Agreement, Gold purportedly paid a lump sum of cash to SDLA to allegedly purchase SDLA's future receivables at a discount and SDLA, in turn, agreed to repay the face value of its receipts through daily payments to Gold.

10. While nominally identified as a purchase of future receivables, the terms of the MCA Agreement, along with the Defendants' actions, demonstrate that despite the form of their agreement, no sale of actual receivables took place and that the form of the MCA agreement was merely a sham to evade applicable lender and usury laws. In reality, the parties entered into a transaction where the effective interest rate exceeded 311% - a rate far greater than the maximum 10% permitted under California law by a lender without a California Finance Lender's License.

11. Gold, pursuant to the terms of the MCA Agreement, and by its conduct, does not bear the risk that would ordinarily be associated with a true sale. Instead, the MCA Agreement transfers all risk to Plaintiffs, as borrower. As a result, Gold never made a *bona fide* purchase of SDLA's receivables and the transaction constitutes a usurious loan.

12. The State of California's usury limitations are a fundamental policy of the State of California that are enshrined in Article XV of the California Constitution. California courts have rejected efforts to suborn, evade, or dilute this fundamental legal protection for California individuals and businesses through artifice, fraud, deceit, and clever drafting.

13. This action encompasses various state and federal causes of action relating to the usurious loan and unconscionable agreements, as well as Defendant's conduct to collect on

them, including broader claims for violations of the Racketeer Influenced and Corrupt Organizations Act ("**RICO**") and Conspiracy.

14. The causes of action are brought against Gold NY, Gold CT, MCA Receivables, Ace, and its three affiliated persons (all with the last name Gold) Josef, Zac, and Daniel and Does 1-20 for their roles in the predatory practices at issue in this matter.

## JURISDICTION AND VENUE

15. This Court has jurisdiction over the subject matter pursuant to 28 U.S.C. § 1331. This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(a) as such claims are so related to the claims in the action within such original jurisdiction and contain the same nucleus of facts that they form the same case or controversy.

16. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events or omissions giving rise to the claim occurred in this jurisdiction

17. This Court has personal jurisdiction over the nonresident Defendants for one or more of the following reasons:

    A. Defendants purposefully directed activities and consummated the MCA Agreement with a California resident;

    B. The claims set forth herein arise from or relates to the Defendants' forum-related activities in making and attempting to collect on a usurious loan;

    C. Upon information and belief, Defendants solicit or engage in business in the forum state;

    D. Upon information and belief, the Defendants conspired to engage in unlawful activity within the forum state; and

    E. Exercise of jurisdiction comports with due process notions of fair play and substantial justice.

## THE PARTIES

18. Plaintiff SDLA Courier Services, Inc. ("SDLA") is a California corporation with a principal place located at 1865 W. 222nd Street, Ste. B, Torrance, CA 90501, which is located in the Central District of California.

19. Plaintiff James Goodman, Jr. ("Goodman") is an individual and sole shareholder of SDLA.

20. Defendant City Capital NY LLC d/b/a Gold Capital USA ("Gold CT") is a Connecticut limited liability company with a principal place of business located at 360 Bloomfield Ave., Ste. 301, Windsor, CT 06095. Upon information and belief, Gold CT is not registered as a foreign limited liability company in the State of California. Upon information and belief, Gold CT does not possess a California Finance Lender's License granted by the State of California, Department of Financial Protection and Innovation.

21.  Upon information and belief, Defendant City Capital NY LLC d/b/a Gold Capital USA ("Gold NY") is a New York limited liability company with a principal place of business located at 164 20th Street, Ste. 4E, Brooklyn, NY 11232. Upon information and belief, Gold NY is not registered as a foreign limited liability company in the State of California. Upon information and belief, Gold NY does not possess a California Finance Lender's License granted by the State of California, Department of Financial Protection and Innovation.

22. Upon information and belief, Defendant MCA Receivables Group LLC ("MCA Receivables") is a Delaware limited liability company and principal of Gold CT with a principal place of business located at 8 The Green, Ste. A, Dover, DE 19901-3618. Upon information and belief, MCA Receivables is not registered as a foreign limited liability company in the State of California, the State of New York, or in the State of Connecticut. Upon information and belief, MCA Receivables does not possess a California Finance Lender's License granted by the State of California, Department of Financial Protection and Innovation.

23. Upon information and belief, Defendant Ace Recovery Group LLC ("Ace") is a New York limited liability company with a principal place of business located at 164th 20th St., Ste. 4E, Brooklyn, NY 11232-1151.

24. Upon information and belief, Defendant Josef Gold ("Josef") is an individual residing in an unknown location. Upon information and belief, Josef is an officer and/or agent of Gold.

25. Upon information and belief, Defendant Zach Gold ("Zach") is an individual residing in an unknown location. Upon information and belief, Zach is and officer and/or agent of Gold.

26. Upon information and belief, Defendant Daniel Gold ("Daniel") is an individual residing in an unknown location.  Upon information and belief, Owner and Chief Executive Officer of Ace.

27. Defendant Does 1-20 are other individuals or entities, presently unidentified, that upon information and belief are also engaged, directly or indirectly, in the conduct giving rise to this Complaint. Plaintiffs are unaware of the names of these other potential defendants who may be responsible for the unlawful practices, acts, conduct, and occurrences alleged therein. Plaintiffs will seek leave of the Court to amend this Complaint to allege the true names and capacities of these unknown defendants and to detail the roles they played, once their identities and/or manner of participation in the wrongful conduct herein is ascertained.

28. Upon information and belief, at all relevant times and as alleged more fully herein, each Defendant acted as an agent, servant, employee, co-conspirator, alter-ego and/or joint venturer of one or more of the other Defendants, and in doing the things alleged herein, acted within the course and scope of such agency, employment, alter-ego and/or in furtherance of the joint venture. Upon information and belief, each of the Defendants' acts alleged herein were done with the permission and consent of each of the other Defendants.

## **BACKGROUND OF MCA INDUSTRY**

### A.  The Predatory MCA Industry

29. The merchant cash advance ("**MCA**") industry specializes in providing high-risk, high interest rate loans to small and mid-size businesses.  As a whole, the MCA industry seeks to hide within the gray areas of the law, attempting to take advantage of procedural remedies and loopholes in distant state courts to disguise its predatory lending practices.

30. The Federal Deposit Insurance Corporation ("**FDIC**") has stated that "predatory lending" involves at least one of the following elements: (1) making unaffordable loans based on the assets of the borrower rather than on the borrower's ability to repay an obligation; (2) inducing a borrower to refinance a loan repeatedly in order to charge high points and fees each time the

loan is refinanced…; or (3) engaging in fraud or deception to conceal the true nature of the loan obligation, or ancillary products, from an unsuspecting and unsophisticated borrower."[2]

31. MCA companies frequently require unaffordable payments that they know the debtor is unlikely to repay. They further leverage various legal and contractual processes to guarantee full repayment under the contracts.  Generally speaking, MCA companies will sue a borrower with the intent to obtain a default judgement, knowing that the borrower is unlikely to retain counsel because they cannot afford it. In other cases, MCA companies will initiate a lawsuit with the intent of forcing a borrower to enter into an onerous settlement agreement, whereby a debtor remains obligated to make all the remaining payments and waive any rights to prosecute a claim against the MCA lender.

B.  MCA Agreements Are Substantively and Procedurally Unconscionable

32. Generally, MCA agreements are unconscionable contracts of adhesion that are not negotiated at arms-length. MCA agreements further target businesses facing a cash crunch and possible closure.

33. Such agreements often contain many one-sided terms that seek to place all risk of loss on the borrower and maximize the lender's ability to collect full payment under the contract.

34. Among the one-side terms that are typical in MCA agreements are: (1) a provision giving the MCA company an irrevocable right to withdraw money directly from the merchant's bank accounts, including collecting checks and signing invoices in the merchant's name; (2) a provision preventing the merchant from transferring, moving or selling the business or any assets without permission from the MCA company, (3) a one-sided attorneys' fees provision obligating the merchant to pay the MCA company's attorneys' fees but not the other way around; (4) venue and choice-of-law provisions requiring the merchant to litigate in a foreign jurisdiction under the laws of a foreign jurisdiction with substantive law more favorable to the MCA company, (5) waivers of the borrower's procedural defenses; (6) a personal guarantee, the revocation of which is an event of default, (7) a jury trial waiver, (8) a class action waiver,

(9) a collateral and security agreement providing a UCC lien over all of the merchant's assets, (10) a prohibition against obtaining financing from other sources, (11) an assignment of lease of the merchant's premises in favor of the MCA company, (12) the right to direct all credit card processing payments to the MCA company, (13) a power-of-attorney permitting the MCA lender to take any action or execute any instrument or document to settle all obligations due; and (16) consent to electronic communications on behalf of the merchant and the merchant's associates in order to collect payment.

35.     Generally, MCA agreements are also unconscionable because they contain numerous knowingly false statements. Among these knowingly false statements are that: (1) the transactions are not loans, (2) the weekly payment is a good-faith estimate of the receivables, (3) the fixed weekly payment is for the borrower's convenience, (4) there is no repayment term; (5) the automated ACH program is a labor-intensive (and not automated) process requiring the MCA company to charge an exorbitant ACH Program Fee or Origination Fee.

36.     In addition, the MCA Agreements are unconscionable because they are designed to fail and cause the merchant to default. Among other things, the MCA Agreements are designed to result in a default in the event that the merchant business suffers any downturn in revenues (1) because the reconciliation provision will not, in any case, result in an adjustment of the daily remittance; (2) by preventing the merchant from obtaining other financing, (3) and by requiring the merchant to continuously represent and warrant that there has been no material adverse changes, financial or otherwise, in such condition, operation, or ownership of the merchant.

37. In addition, MCA agreements also generally contain numerous penalties that violate fundamental public policy of California. Among these improper penalties, the MCA agreements (1) require the merchant to sign a confession of judgment entitling the MCA company to liquidated attorneys' fees based on a percentage of the amount owed rather than a good-faith estimate of the attorneys' fees required to file a confession of judgment, (2) accelerate the entire debt upon an Event of Default, and (3) require the merchant to turn over 100% of all of its receivables if it misses just one fixed payment.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## FACTUAL BACKGROUND OF THIS DISPUTE

### The MCA Agreement

38. As alleged above, SDLA is a courier service that delivers packages for a single customer: Amazon. Under SDLA's contract with Amazon, SDLA must deliver packages in a certain order and under certain conditions in order to be paid. Payment from Amazon often comes after significant delays. All of SDLA's revenue came from Amazon.

39. Between March and June 2024, SDLA sought financing. SDLA acquired a broker who, in turn, filed an application with a third party.

40. Upon information and belief, Josef obtained SDLA's file. Josef reached out to John Goodman, SDLA's Chief Executive Officer ("John Goodman"), via telephone and text message.

41. As an inducement to have SDLA enter into an agreement, upon information and belief, on or about June 2024, Josef promised John Goodman through text message or other electronic communication that if they were to enter into an agreement after making payments at $8,000 per day for two weeks, that Josef would move payments down to $1,000 per day.

42. Gold and SDLA entered into the MCA Agreement on or about June 6, 2024. See **Exhibit A** attached hereto.

43. Upon information and belief, Gold NY or Gold CT entered into the MCA Agreement. On the upper right-hand corner of the MCA Agreement, there is a clause stating that the agreement is between "GOLD CAPITAL USA, having a place of business in Connecticut and New York…" and there are no signature lines on the MCA Agreement for any Gold entity signers.

44. Further, upon information and belief, both Gold NY and Gold CT, operate under the fictitious business name "Gold Capital USA" so there is no way to distinguish which Gold entity entered into the MCA Agreement and which party would be responsible for the performance under the contract.

45. The MCA Agreement consists of "Terms and Conditions" with several addenda, each together constituting one agreement. Each page of the MCA Agreement is written in an

extremely small font size less than 10-point font which makes it hard for the parties to read or understand the contract terms.

A. <u>Payment Terms</u>

46. The MCA Agreement purportedly purchased SDLA's "future receivables" (*i.e.*, receivables for goods and services that have not yet been rendered and do not yet exist), in exchange for a sum of money.

47. The MCA Agreement defines "Future Receipts" as "all payments made by cash, check, or electronic transfer or other form of monetary payment deposited into Merchants [sic] Bank Account."

48. The MCA Agreement alleges that Gold purchased $749,500.00 (the "**Purchased Amount**") at a purchase price of $500,000 (the "**Purchase Price**") in exchange for daily remittances of $8,000.00 (the "**Remittance**").

49. The MCA Agreement also alleges that Gold purchased the Future Receipts at a "Purchased Percent" of 40%. The term "Purchased Percent" is undefined.

50. Gold described the Remittance as "a good faith estimate of the Purchased Percentage multiplied by the revenues of the Merchant." There is no formula indicated how Gold arrived at the "Purchased Percent", there is also no indication how the Remittance is a product of the Purchased Percent and the revenues of the Merchant, or what the revenues of the Merchant allegedly were at the time of entering into the MCA Agreement.,

51. Gold, in its sole discretion, determined the Purchased Amount, the Purchased Percentage, the Purchase Price, and the Remittance. SDLA did not have any right to determine the value or the payment structure of the so-called "sale." As a result, the MCA Agreement does not constitute a *bona fide* credit sale.

52. The MCA Agreement further provides that Gold will "debit the Remittance each business day from only one depositing bank account, which must be acceptable to and pre-approved by [Gold] into which [SDLA] and [SDLA's] customers shall remit the Receipts from each Transaction until such time as [Gold] receives payment in full of the Purchased Amount."

53. Although the MCA Agreement purports to deliver the Purchase Price to SDLA, the MCA Agreement also requires SDLA to "pay" Gold certain fees as deductions from the Purchase Price. Such fees include an "underwriting fee" equal to "15% of the Purchased Amount", an "Origination Fee" equal to "up to 28% of the purchase price [sic] to cover the cost of Origination and ACH Setup", a "Default Fee" of "$5,000 or 10%ofthefundedamount(ifamerchantchangesbankaccountsorswitchestoanothercreditcardprocessorwithout [sic] [Gold's] consent or commits another default pursuant to the Agreement…" in addition to a plethora of other fees such as, ACH fees, wire fees, bank charge fees, that have the effect of a in a unilateral reduction of the Purchase Price.

54. Bottom line, although Gold purported to purchase $500,0000 of future receivables, upon information and belief, Gold did not deliver it to SDLA.

B. The MCA Agreement Transfers Risk of Loss to Borrower

55. The MCA Agreement also contained numerous provisions to transfer risk of loss away from Gold and solely onto Plaintiffs.  Such provisions include: (1) a sham reconciliation clause; (2) a defined term; (3) the granting of a security interest; (4) a personal guaranty; (5) clauses permitting so-called "Protections Against Default"; and (6) general provisions that grant Gold one-sided procedural and substantive rights to enforce the term of the MCA Agreement, such as a prejudgment remedy waiver.

i. Sham Reconciliation Provision

56. The MCA Agreement contains a conditional reconciliation provision and Remittance Adjustment Provisions.

57. Section 1.4 entitled "Reconciliation" states that so long as there is no breach of the agreement "once per calendar month" SDLA may requests a "retroactive reconciliation of the "total Remittance Amount", which is defined as "all payments made by [SDLA] to Gold after [Gold] remitted the Purchase Price to [SDLA]." The provision further states that the reconciliation will result in "either crediting or debiting the difference back to Merchant…so that the total amount debited by [Gold] shall equal the Specific Percentage of Future Receipts

that [SDLA] Collected [sic] from the date of this Agreement up to and including the date of the Reconciliation request."

58. The reconciliation fails to reconcile by its own logic. If a company is experiencing a decrease in performance, then the borrower is unlikely to pay the Remittance without an adjustment. As such, it will likely default on the agreement, which, in turn, would permit Gold not to perform a reconciliation. Further, the reconciliation clause, as drafted, does not reconcile anything. It merely exists to ensure that Gold receives its benefit of the bargain.

59. Section 1.4 is entitled.  "Adjustment to the Remittance". This provision alleges the merchant is permitted to "request a decrease in the Remittance…  once every two calendar weeks provided that an Event of Default has not occurred. Gold does not contemplate making a permanent adjustment to the remittance rather it is contemplated as a conditional adjustment whereby the Remittance "shall return to the Remittance as agreed on page 1 of this Agreement" after a two-week "grace" period.  As such, the adjustment provision merely permits Gold to adjust the Remittance such that it obtains the amount it purchased – it does not permit an adjustment based on the actual performance of the borrower's business.

ii.  <u>Implied Term</u>

60. The MCA Agreement provides an implied payment term, since the Remittance amount is fixed and not subject to actual adjustment. It is possible to determine the implied term by dividing the "Purchased Amount" by the "Remittance Amount."

61. Here, the estimated term is 93.7 calendar days. In other words, Gold expected an annualized return on investment of 629.63% return on investment in 93.7 calendar days.

iii.  <u>Granting of Overly Broad Security Interest</u>

62. The MCA Agreement contains an addendum entitled "Security Agreement" to secure SDLA's payment and performance obligations under the MCA Agreement.

63. Rather than taking a security interest in merely the future receivables of SDLA, the security agreement grants Gold a security interest in and a "lien upon all of their present and future: (a) accounts (the "Accounts Collateral"), chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are each defined in Article 9 of the

Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by [SDLA] and/or Guarantor(s), (b) all proceeds, as that term is defined in Article 9 of the UCC (c) funds at any time in the [SDLA's] and/or Guarantor(s) Account, regardless of the source of such funds, (d) present and future Electronic Check Transactions, and (e) any amount which may be due to [Gold] under this Agreement, including but not limited to all rights to receive payments or credits under the Agreement (collectively, the "Collateral")."

64. The security interest granted to Gold "may be exercised by [Gold] without notice or demand of any kind by making an immediate withdrawal or freezing of the Collateral…" and that Gold "may direct the disposition of the Collateral, without the further consent of [SDLA].",

65. In addition, under the security agreement, SDLA must also "execute any documents or take any action in connection with this Agreement as [Gold] deems necessary to perfect of maintain [Gold's] first priority security interest in the Collateral.

66. Upon information and belief, Gold did not have a first priority position in the Collateral. Upon information and belief, Gold filed a UCC-1 on July 30, 2024.

67. As such, the security agreement grants Gold with recourse against the borrower for failure to make a payment against any and all assets of the borrower and the guarantor without notice or presentment.

iv. Personal Guaranty

68. Gold further transferred risk of loss by requiring a personal guaranty from Goodman.

69. The Guaranty required that Guarantor guarantee "jointly and severally" liable for the "all amounts owed to [Gold] in the Event of Default." The Guaranty further states that in "the event of a breach…[Gold] may seek recovery from Guarantors for all of [Gold's] losses and damages by enforcement of [Gold's] without first seeking to obtain payment from [SDLA]…"

v. Protections Against Default

70. Section 1.13 sets forth certain "Protections Against Default." In essence, these so-called "protections" are remedies that Gold may exercise "immediately and without notice" upon an event that hinders, restricts, or limits Gold's ability to collect payments under the MCA Agreement.

71. Such "protections" permit Gold to (1) "collect the full uncollected Purchased Amount plus all fees (including reasonable attorneys' fees) due under this Agreement and the Security Agreement become due and payable in full immediately"; (2) "enforce the provisions" of the Limited Personal Guaranty of Performance against Guarantor(s); (3) "enforce its security interest in the Collateral"; (4) "The entire Purchased Amount and all fee (including reasonable attorney's fees) shall become immediately payable to [Gold] from Merchant;; (5) "[Gold] may proceed to protect and enforce its rights and remedies by lawsuit..."; (6) this "Agreement shall be deemed Merchant's assignment of Merchant's Lease of Merchant's business premises…"; and (7) "[Gold] may debit [SDLA]'s depository account…for all sums due."

72. As such, these "protections" permit Gold to take over all accounts and the borrower's businesses upon the occurrence of an Event of Default or any other occurrence that would disrupt Gold's ability to unconditionally collect payment under the MCA Agreement.

73. The MCA Agreement contains broad definitions of Events of Default that are designed to maintain as much control over the borrower's business as possible and to maximize likelihood that a default will occur under normal circumstances. The Events of Default are further designed to eliminate a borrower's ability to defend itself from Gold's predatory lending practices and maximize Gold's ability to collect the full value of the Purchased Amount.

74. Under Section 3.1, "Events of Default" include, but are not limited to the following: (1) "Merchant or any Guarantor shall violate any term or covenant in this Agreement or any other MCA Document"; (2) "Merchant fails to pay (or cause to be paid) any fees described on Appendix A attached hereto when and as required to be paid…"; (3) "the sending of notice of termination or notifying [Gold] of its intent to breach this Agreement"; (4) "[SDLA] transfers or sells all or substantially all of its assets"; (5) "[SDLA] enter[s] into any financing agreements with any other party including but not limited to: Loans, Merchant Cash Advances, Receivables financing, or any other agreement that will increase the total debt owed by Merchant to any other party".

75. In other words, an Event of Default will occur unless Gold receives the full Remittance on time until it receives the Purchased Amount. If a SDLA attempts to do anything other than

make a full payment on time and when due, it is considered an Event of Default. Simply put, the Events of Default are the mechanism by which Gold enforces the absolute and unconditional payment obligations under the MCA Agreement.

### vi.  General Positions

76. The MCA Agreement sets forth other provisions that are designed to transfer risk away from Gold and grant Gold with procedural and substantive protections to increase the likelihood of enforcing the absolute repayment obligations under it.

77. For instance, Section 1.9 states that Gold will not be liable "for any claims" under "any legal theory" for "lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by [SDLA] and Guarantor." Further, the provision states that "[SDLA] and Guarantor will be jointly liable for all of [Gold's] attorneys' fees and expenses" if SDLA has the audacity to assert a claim against Gold.

78. Section 4.5 of the MCA Agreement sets forth governing law provisions. The MCA Agreement states that the "Agreement shall be governed by and construed in accordance with the laws of the State of Connecticut, without regards to any applicable principals of conflict of law." The MCA Agreement further states that any actions arising from the Agreement "shall be, if [Gold] so elects, instituted in any Connecticut state court sitting in the country of Fairfield, or the State of New York, county of Kings, without regard to conflict of law provisions…" sitting in Connecticut…" and that SDLA waives "any right to oppose any motion or application made by [Gold] to transfer such proceeding to an acceptable forum." These forum selection clauses are conditional and may only be exercised if "Gold" so elects.

79. Upon information and belief, Gold has intentionally asserted Connecticut law because it intends to seek a prejudgment remedy without securing a court order under Connecticut General Statutes Sections 52-278a through 52-278m. As such, the MCA Agreement requires SDLA to waive "…all rights to notice and prior court hearing or court order in connection with any and all prejudgment remedies to which [Goldd] may be entitled by virtue of *any default* or provision in this agreement and...all rights to request that [Gold] post a bond…to protect said

merchant or guarantor against damages that may be caused by any prejudgment remedy…"(emphasis added). Upon information and belief, this reference to Connecticut law would permit Gold to attach its claims to the Purchased Amount to SDLA's assets as a prejudgment remedy without a hearing or court order.

80. Section 4.6 requires that all representations, warranties, and covenants "survive the signing and delivery of this Agreement…until all obligations under this Agreement *shall have been satisfied in full* and this Agreement shall have terminated." (emphasis added).

81. In addition, there are several representations contained in the Agreement which Gold knew or should have known that SDLA would breach just by signing the MCA Agreement. In particular, there are representations that "[SDLA] has good, complete, unencumbered, and marketable title to the Receipts" which Gold knew was not the case based on the number of UCC-1s on public record with SDLA. Further, there is a clause that states that "Merchant's performance under this Agreement will not cause or create an event of default" – which, Gold also knew SDLA would violate because it knew that SDLA had other contracts with other merchant cash advance lenders.

**Gold Freezes SDLA Bank Accounts**

82. On or about June 2024, SDLA requested to lower payments according to previous correspondence between Josef and John Goodman.

83. John Goodman issued a text message stating that "You agreed with me via our text messages that I can send you [$8,000 for two weeks] and that you would take this down to $1,000 after the second week. You said yesterday again that you would take it down to $1,000. Now I'm not hearing from you not answering my calls or my text messages. I will miss payroll as we discussed when you agreed these would go down to $1100 a day…Please call me."

84. Josef replied "I need todays [payment] cleared bc it's pulled first thing in the am" and that "We can lower tomorrow as first." Josef further texted stating SDLA via text message that "if you need to lower payments that's okay [sic]."

85. The following day, John Goodman stated "Hey Josef per our text messages [and] conversation[,] [p]lease resubmit ACH for $1000 daily. I appreciate it."

86. In the evening of the same day, John Goodman stated, "Hey Josef, are you going to contact and talk to me?"

87. John Goodman further sought confirmation from Josepf to reduce payments the following day.  Josef replied "Can you balance payments till then?"

88. In response, John Goodman stated "Josef you agreed to reduce the payments in advance."

89. Upon information and belief, Josef did not provide any further responses to SDLA or John Goodman.

90. Upon information and belief, Gold did not modify the Remittance.

91. As a result of Josef's bait and switch, SDLA was then unable to make payments resulting in a breach of the MCA Agreement. In response, upon information and belief, on or about July 17, 2024, Gold issued a lien notice to Wells Fargo, N.A., where SDLA held its funds, asserting privileges under UCC 9-406.

92. Upon information and belief, since Wells Fargo, N.A. would not release funds to SDLA, SDLA was unable to meet its financial obligations under its other contracts and/or pay its employees.

### The Settlement Agreement

93. On or about July 16, 2024, Gold entered into an agreement with Plaintiffs (the "**Settlement Agreement**"). See **Exhibit B** attached hereto.

94. Upon information and belief, a Gold entity entered into the Settlement Agreement.

95. The Settlement Agreement whereby in exchange for a "letter authorizing the release of funds from Wells Fargo, N.A." and releasing "all bank account holds and UCC liens…" in exchange for paying Gold $755,000.

96. Payments to Gold were broken up into two components. SDLA will transfer "$195,000 from its bank account at WELLS FARGO, N.A. to CITY'S counsel" and that Gold shall debit "$8,000 every business day commencing on Friday, July 26nd [sic], 2024 and end November 2nd, 2024 until the Settlement Payment has been fully satisfied."

97. The Settlement Agreement further states that once SDLA pays the $195,000, the "remaining balance owed by SDLA will be $560,000."

98. The Settlement Agreement also contained a variety of other terms onerous and one-sided terms, including, but not limited to: (1) "filing a Motion for Summary Judgment in lieu of Complaint"; (2) requiring SDLA to agree that "this Agreement is not being signed under any duress or any undue influence" in two separate provisions of the Settlement Agreement."

99. The Settlement Agreement also contains mutual release to be effective "once SDLA complies with paragraph 1 to pay the Settlement Payment, in full…" at which point the "Parties mutually, irrevocably, and forever remise, release, and forever discharge" all damages, claims, etc., including "any and all claims or counterclaims that were raised or could have been raised in the Action or relating to the Contract or any claims relating to arising out [sic] of this Agreement."

100.    SDLA signed the Settlement Agreement under economic duress because (1) SDLA had no ability to exercise free will because Gold had access to SDLA's only bank account; (2) Gold sought to wrongfully enforce the terms of a usurious loan and/or forbearance by entering into the Settlement; and (3) circumstances permitted SDLA no other reasonable alternative but  to succumb to the terms of the Settlement Agreement or otherwise face bankruptcy or financial ruin.

### The UCC Lien Notice

101.    On August 5, 2024, Amazon terminated its contract with SDLA.  As a result, SDLA had no future receivables to remit to Gold.

102.    On August 7, 2024, SDLA sent an email to reconciliations20@gmail.com, Josef, and Zach, requesting a reconciliation and an adjustment as part of the Daily Remittance under the MCA Agreement.

103.    Zach replied to SDLA's email on August 7, stating "[p]lease review the attached Settlement agreement which is currently active, the contract was breach and no longer current, it was replaced with the settlement agreement which was signed by you. Unfortunately there is no basis for reconciliation. Thank you!"

104.     On or about August 14, 2024, Ace issued a UCC Lien Notice (the "UCC Lien Notice") to Amazon alleging that SDLA owed Gold $724,700.00, even though SDLA paid Gold the $195,000 balance in the Settlement Agreement.  See **Exhibit C** attached hereto.

105.     On or about August 20, 2024, SDLA, through its counsel, received a payment summary from Zach.  The payment summary shows a total balance of $878,700, commencing in June 2024 and nearly $130,000 more than the bargained contract and does not apply the $195,000 received as part of the Settlement Agreement. See **Exhibit D** attached hereto.

**Notice of No Future Receivables**

106.     On or about August 21, 2024, SDLA, through its counsel, demanded that Gold withdraw the UCC Lien Notice as "SDLA has no source of income and thus does not have any future receivables." **See Exhibit E** attached hereto.

107.     In response to receiving the notice of no future receivables, on August 21, 2024, Zach responded blithely in an email "Your client signed a release for all parties involved. thanks".

108.     Gold then issued a second UCC lien notice on SDLA's Chase Bank account thereby freezing all of SDLA's remaining capital.

**FIRST CAUSE OF ACTION**

**RICO, 18 U.S.C. § 1962**

(Against All Defendants)

109.     SDLA repeats and realleges all of the paragraphs in this Complaint as though fully set forth herein.

A.  The Unlawful Activity

110.     There are at least three (3) predicate acts underlying the First and Second Causes of Action -- making of unlawful debts (usury); engagement in wire fraud; and collection of unlawful debts.

111.     As set forth more fully above, despite the many false statements and contract terms to the contrary, the financial arrangement between Gold and SDLA were loans.

112.    California limits the amount of interest that can be charged in connection with providing a commercial loan. Upon information and belief, Gold knowingly made loans to multiple California businesses.

113.    Here, the interest rate that Gold charged under the MCA Agreement was 241%.

114.    The disclosures Defendants made about these loans are clearly fraudulent (for example, the MCA Agreement contains a representation it is a "Sale of Receipts (THIS IS NOT A LOAN)" and violate California usury law, as set forth herein.

115.    In the process of making and collecting on these loans, Defendants utilized wire transfers and electronic communications to further their illegal activities.

B.    Culpable Persons

116.    Each and every one of the Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that each is either an individual, corporation, or limited liability company capable of holding a legal interest in property.

117.    At all relevant times, each of the Defendants were, and is, a person that exists separate and distinct from the Enterprise, described below.

118.    Upon information and belief, the Defendants had a legal and beneficial interest in the ill-gotten proceeds derived from the Enterprise and knowingly and willfully worked in concert in order to originate and collect upon usurious loans.

C.    The Enterprise

119.    The Defendants together constitute an Enterprise (the "**Enterprise**") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

120.    The Defendants are associated in fact and through relations of ownerships the common purpose of carrying on an ongoing unlawful enterprise. Specifically, the Enterprise has a common goal of soliciting, through an array of brokers, funding, servicing, and collecting upon usurious loans that charge interest at more the enforceable rate under the laws of California.

121.    Upon information and belief, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreement relating to and for the purpose of originating, underwriting,

servicing, and collecting upon unlawful debt issued by the Enterprise to small businesses throughout the United States, including at least the MCA Agreement and the Settlement Agreement with SDLA.

122.    Upon information and belief, Gold has entered into at least a dozen merchant cash advance transactions with businesses in California.

123.    Defendants Gold entered into the MCA Agreement.

124.    Gold entered into one or more agreements with Ace to enforce the MCA Agreement and the Settlement Agreement and to collect unlawful debts.

125.    Daniel, using Ace as an instrumentality, used deceptive acts and practices to collect on the unlawful debt.

126.    Josef and Zach, using the Gold entities instrumentalities, used deceptive acts and practices to originate unlawful debt and induce SDLA into entering into agreements.

127.    Upon information and belief, MCA Receivables provides the capital required for Gold to fund unlawful debt with third parties.

128.    The debt evidenced by the MCA Agreement constitutes an unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) 18 U.S.C. § 1961(6) because (i) it violates applicable criminal usury statutes, and (ii) the rates significantly exceed the legal rate permitted under California law.

129.    The debt evidenced by the Settlement Agreement constitutes an unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) 18 U.S.C. § 1961(6) because (i) it violates applicable criminal usury statutes, and (ii) the rates significantly exceed the legal rate permitted under California law.

130.    Upon information and belief, since at least 2023 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of collecting fraudulent fees through electronic wires.

131.    Enterprise's misconduct also constitutes "fraud by wire" within the meaning of 18 U.S.C. 1343, which is "racketeering activity" as defined by 18 U.S.C. 1961(1). Its repeated

and continuous use of such conduct to participate in the affairs of the Enterprise constitutions a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

      D. <u>The Roles of the RICO Persons in Operating the Enterprise, and the roles of the individual companies within the Enterprise</u>

132.    The Defendants have organized themselves and the Enterprise into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts, including as follows:

<u>Zach Gold</u>

133.    Upon information and belief, Zach is the mastermind of the Enterprise. He is responsible for the day-to-day operations of the Enterprise and has final say on all business decisions of the Enterprise, including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, the payments terms, amounts, and period of each usurious loan.

134.    In his capacity as the mastermind of the Enterprise, Zach is responsible for creating, approving, and implementing policies, practices, and instrumentalities used by the Enterprise to accomplish its common goals and purposes, including: (1) the form of the merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of unlawful debts; and (2) the method of collecting the daily payments via ACH withdrawals. All such forms were used to make and collect upon the lawful loans, including, without limitation, loans extended to SDLA.

135.    Upon information and belief, Zach has taken actions and directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise, including, but not limited to, directing the affairs of the Enterprise, funding the Enterprise to collect upon the unlawful debts and executing legal documents in support of the Enterprise.

136.     Zach has ultimately benefitted from the Enterprise's acquisition of usurious loan proceeds by Gold, MCA Receivables, Daniel, Josef, and Does 1-20.

Gold

137.     Upon information and belief, Gold CT is organized under the laws of Connecticut and maintains officers, books, records, and bank accounts independent of Zach and the other Defendants.

138.     Upon information and belief, Gold NY is organized under the laws of New York and maintains officers, books, records, and bank accounts independent of Zach and the other Defendants.

139.     Upon information and belief, Gold CT and Gold NY are part of an unlawful enterprise to collect upon unlawful debts and commit wire fraud. Pursuant to its membership in the Enterprise, Gold CT and Gold NY have upon information and belief: (1) entered into contracts with brokers to solicit borrowers to identify targets to grant the Enterprise's usurious loans; (2) underwritten the usurious loans and determined the ultimate rate of interest to be charged under each loan; (3) entered into so-called merchant cash advance agreements on behalf of the Enterprise; (4) serviced the usurious loans; and (5) set up and implemented the ACH withdrawals used by the Enterprise to collect on the unlawful debt.

140.     Gold, upon information and belief, solicited SDLA, through one or more brokers, and underwrote the MCA Agreement, entered into the MCA Agreement, and collected upon unlawful debt by effectuating daily ACH withdrawals and other payments from SDLA's accounts.

Ace

141.     Upon information and belief, Ace has entered into certain agreements with Gold to collect upon the unlawful debts.

142.     Upon information and belief, Ace operates out of the same office as Gold NY.

143.     Ace, through Daniel, have operated in such a manner to use unfair and deceptive trade practices to collect upon the unlawful debt and benefit from the ill-gotten proceeds derived therefrom.

### MCA Receivables

144.    Upon information and belief, MCA Receivables is the sole member of Gold.

145.    Upon information and belief, MCA Receivables is an entity that obtains investments and other proceeds in order to provide usurious loans to borrowers.

146.    Upon information and belief, MCA Receivables receives the benefit of the ill-gotten gains to dole out distributions to its members and other investors.

### Josef Gold

147.    Upon information and belief,  Josef is an agent or officer of Gold and has conspired with Zach and Gold  to conduct the Enterprise. Specifically, Josef collaborated in identifying and inducing SDLA to enter into the MCA Agreement and to create conditions to permit Gold to obtain  control over SDLA's assets.

### Daniel Gold

148.    Upon information and belief, Daniel is the owner of Ace and determines how, when, and where Ace will seek to collect upon unlawful debts.  Daniel was the main person seeking to collect and enforce unlawful debt obligations.

E.    Interstate Commerce

149.    The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

150.    Upon information and belief, all of the transactions relevant to this case were conducted through ACH payments and all communications were conducted through phone, text, or electronic messaging.

151.    Upon information and belief, the Enterprise received funds collected from other illegal activities conducted within the State of California and elsewhere in the United States of America.

152.    Further, upon information and belief, members of the Enterprise maintain offices in Connecticut, California, and New York. The Enterprise also uses personnel in these offices to originate, underwrite, fund, service, and collect upon the usurious loans made by the Enterprise through the extensive use of instrumentalities of interstate commerce, including

emails, mail, write transfers, and bank withdrawals processed through an automated clearing house.

153.     In the present case, all communications between the members of the Enterprise and SDLA were conducted by interstate email and mail, wire transfers, or ACH debits and other interstate wire communications. Specifically, the Enterprise used interstate emails to originate, underwrite, service, and collect upon the MCA Agreement and the Settlement Agreement, fund the advances under each of the MCA Agreement, and collect the payments via electronic ACH debits.

F.   <u>Injury and Causation</u>

154.     SDLA has been and will continue to be injured in its business and property by reason of the Defendant's violations of 18 U.S.C. § 1962(c), according to proof at trial, specifically, including, but not limited to, engaging in loan sharking on a scale as to destroy SDLA's business in its entirety.

155.     The injuries to SDLA were directly, proximately, and reasonably foreseeably resulted from or caused by these violations, including, but not limited, thousands of dollars improperly collected by criminally usurious loan payments, breaches of agreements with third parties, the freezing of bank accounts, and laying off all employees as SDLA had no source of income.

156.     SDLA has also suffered damages by incurring substantial attorneys' fees and costs associated with exposing and prosecuting the Defendants' criminal activities.

157.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from Defendants.

158.     Plaintiffs are experiencing on-going harm for which money damages would not be adequate.

**SECOND CAUSE OF ACTION**

**Conspiracy, 18 U.S.C. § 1962(d)**

(Against All Defendants)

159.    Plaintiffs repeat and reallege all of the paragraphs in this Complaint as though fully set forth herein.

160.    Defendants have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(c) as describe above, in violation of 18 U.S.C. § 1962(d).

161.    By and through each of the Defendants' business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and frequent use of email communications among the Defendants concerning the underwriting, funding, servicing, and collection of the unlawful loans, including the MCA Agreement and Settlement Agreement, each Defendant knew the nature of the Enterprise and each Defendant knew that the Enterprise extended beyond each Defendant's individual role. Moreover, through the same connections and coordination, each Defendant knew that the other Defendants were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

162.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to collect upon unlawful debts, including the Agreements, in violation of 18 U.S.C. § 1962(c). In particular, each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the Defendants shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund and collect upon unlawful debts, including the MCA Agreements.

163.    Each Defendants agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to commit wire fraud through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

164.    The participation and agreement of each of the Defendants was necessary to allow the commission of this scheme.

165.    Plaintiffs have been and will continue to be injured in its business and property by reason of Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at trial.

166.     The injuries to SDLA directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, thousands of dollars in improperly collected loan payments, termination of third-party agreements based on the Defendants' conduct, and the termination of employees resulting from Defendants' conduct.

167.     Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendant's criminal activities.

168.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from Defendants.

### THIRD CAUSE OF ACTION

### Usury, Cal. Const. Art. XV, Sec. 1 and Cal. Civ. Code § 1916-3

(Against Gold NY and Gold CT)

169.     Plaintiffs repeat and reallege all of the paragraphs in this Complaint as though fully set forth herein.

170.     The MCA Agreement constitutes a loan as defined in Cal. Civ. Code § 1912.

171.     All repayments made, or called for, under the MCA Agreement in excess of the legally permissible amount constitute interest as defined in Cal. Civ. Code § 1915.

172.     Defendants Gold NY and Gold CT, by the terms of the agreements and through their actions, demonstrated that the loan and interest were absolutely repayable by Plaintiffs.

173.     Defendants Gold NY and Gold CT do not have a California Finance Lender's license pursuant to Cal. Fin. Code § 22000, *et seq.* and do not otherwise meet the requirements for exemption from the usury limitation when entering into the MCA Agreement.

174.     Defendants Gold NY and Gold CT, through the terms of the MCA Agreement and by their actions, knowingly, willfully, and intentionally charged interest on the sums advanced in excess of California's usury limitations.

175.     Plaintiffs will experience immediate and irreparable injury, loss, or damages, for which money damages will not be adequate.

**FOURTH CAUSE OF ACTION**

**Usury, Cal. Const. Art. XV, Sec. 1 and Cal. Civ. Code § 1916-3**

(Against Gold NY and Gold CT)

176.    Plaintiffs repeat and reallege all of the paragraphs in this Complaint as though fully set forth herein.

177.    The Settlement Agreement constitutes a loan or forbearance as defined in Cal. Civ. Code § 1912.

178.    All repayments made, or called for, under the Settlement Agreement in excess of the legally permissible amount constitute interest as defined in Cal. Civ. Code § 1915.

179.    Defendants Gold NY and Gold CT, by the terms of the agreements and through their actions, demonstrated that the loan and interest were absolutely repayable by Plaintiffs.

180.    Defendants Gold NY and Gold CT do not have a California Finance Lender's license pursuant to Cal. Fin. Code § 22000, *et seq.* and do not otherwise meet the requirements for exemption from the usury limitation when entering into the Settlement Agreement.

181.    Defendants Gold NY and Gold CT, through the terms of the MCA Agreement and by their actions, knowingly, willfully, and intentionally charged interest on the sums advanced in excess of California's usury limitations.

182.    Plaintiffs will experience immediate and irreparable injury, loss, or damages, for which money damages will not be adequate.

**FIFTH CAUSE OF ACTION**

**Unfair and Deceptive Acts and Practices, Cal. Bus. & Prof. Code § 17200**

(Against Gold NY, Gold CT, Ace, and Does 1-20)

183.    Plaintiffs repeat and reallege all of the paragraphs in this Complaint as through fully set forth herein.

184.    Defendants Gold NY, Gold CT, Ace, and Does 1-20 engaged in unfair business practices as defined in *Cal. Bus. & Prof. Code* § 17200, specifically, they engaged in (1) "acts

or practices which are unlawful and/or or unfair, or (2) fraudulent; and (3) the MCA Agreements were unconscionable.

185.    Specifically, Defendants engaged in one or more of the following unlawful, unfair, and/or fraudulent practices:

i.    Violation of California Constitution, Article XV, Section 1, prohibitions against usury.

ii.    Lending without a CFL License in violation of Fin. Code § 22000, *et seq*.

iii.    Conducting business within the State of California without having first obtained a certificate of qualification from the Secretary of State of California in violation of Cal. Corp. Code §§ 2105 and 2203.

iv.    Failing to provide financing disclosures pursuant to Cal. Fin. Code § 22800, *et al*

186.    In addition, the MCA Agreement and the Settlement Agreement were procedurally and substantively unconscionable. The terms of the MCA Agreement and the Settlement Agreement constitute contracts of adhesion, where the contract terms were outside the reasonable expectations of the weaker party and were unduly oppressive.  Further, the MCA Agreement was written in a font so small as to be barely legible without magnification and SDLA had no bargaining power to negotiate the MCA Agreement and the Settlement Agreement and did not have any other meaningful choice.  Further, the MCA Agreement and the Settlement Agreement were substantively unconscionable because the terms of the agreement reallocate risks such that Plaintiffs bear all risk in a manner that shocks the conscience and violates public policy.

187.    Plaintiffs lack adequate remedies at law and will experience immediate and irreparable injury, loss, or damage for which money damages will not be adequate.

### SIXTH CAUSE OF ACTION

### Intentional Interference with Contractual Relations

(Against Gold NY, Gold CT, and Ace)

188.    Plaintiffs repeat and reallege all of the paragraphs of the Complaint as if fully set forth herein.

189.     Upon information and belief, SDLA had entered into a contract with Amazon to provide courier services (the "**Amazon Agreement**").

190.     At all relevant times, the Amazon Agreement was valid and enforceable.

191.     Gold NY, Gold CT, and Ace had knowledge of the Amazon Agreement and knew that Amazon was SDLA's only customer.

192.     Defendants Gold NY and Gold CT disrupted the relationship by placing a UCC Lien Notice on July 17, 2024 on moneys held by Wells Fargo, N.A. on behalf of SDLA, thereby disrupting SDLA's right to receive and use its proceeds and adversely impacting its ability to pay SDLA's employees. As a result, Amazon terminated the Amazon Agreement with SDLA on August 5, 2024.

193.     Defendant Ace further disrupted the relationship by placing a subsequent UCC Lien Notice on Amazon on August 14, 2024, thereby disrupting SDLA's right to receive its proceeds being held by Amazon.

194.     Upon information and belief, Gold NY, Gold CT, and Ace knew that the interference with the contractual relationship between SDLA and Amazon was certain or substantially certain to occur because they knew that Amazon was SDLA's only client.

195.     As a direct, foreseeable, and proximate result of Gold NY, Gold CT, and Ace's actions Plaintiffs suffered economic harm, including direct and consequential damages loss of profits, future profits, and diminution of value in the business in an amount estimated to be $15 Million Dollars.

196.     Pursuant to Cal. Civ. Code § 3294, Gold NY, Gold CT, and Ace engaged in conduct that was fraudulent, oppressive, and malicious, thereby warranting punitive damages in an amount to be determined at trial.

197.     Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with Gold NY, Gold CT, and Ace's brazen, malicious, and fraudulent conduct.

198.     Plaintiffs will also experience immediate and irreparable injury, loss, or damages for which money damages will not be adequate.

## SEVENTH CAUSE OF ACTION

### Breach of Contract

(Against Gold NY and Gold CT)

199.     Plaintiffs repeat and reallege all of the paragraphs in this Complaint as though fully set forth herein.

200.     SDLA and Gold entered into the Settlement Agreement.

201.     On July 17, 2024, SDLA released $195,000 from the Wells Fargo, N.A. account.

202.     Under the Settlement Agreement, the remaining Settlement Payment should have been $560,000.

203.     Gold alleged that despite making the payment, SDLA, in fact, owed $724,700 and based on the Payment History, SDLA had a total balance of $878,700,

204.     Gold did not modify the amount of the Settlement Payment pursuant to the Settlement Agreement.

205.     In addition, the MCA Agreement states that "Merchant going bankrupt or going out of business, or experiencing a slowdown in business, or a delay in collecting its receivables, in and of itself, does not constitute a breach of this Agreement."

206.     SDLA informed Gold that it had no future receivables because Amazon terminated the Amazon Agreement.

207.     Gold then froze SDLA's assets in its Chase bank account, which is an exercise of a remedy in an Event of Default. Gold has not released the hold on SDLA's Chase bank account.

208.     As such, Gold failed to perform its obligations under the MCA Agreement, constituting a material breach of the MCA Agreement.

209.     Plaintiffs were harmed as a result in amounts and in manner subject to proof at trial.

210.     Gold's breach was a substantial factor in causing Plaintiffs' harm.

## EIGHTH CAUSE OF ACTION

### Breach of Implied Covenant of Good Faith and Fair Dealing

(Against Gold NY, Gold CT, and Josef)

211.    Plaintiffs repeat and reallege all of the paragraphs in this Complaint as though fully set forth herein.

212.    SDLA has attempted to work with Josef, Gold NY, Gold CT in good faith.

213.    Josef promised to reduce SDLA's payment to $1,000 after making two weeks of payments at $8,000.

214.    SDLA performed under the agreement. When SDLA requested to modify the payments, Josef failed to respond and did not modify the payments.

215.    SDLA attempted to give notice to Gold that  it requested a modification to payment terms and by informing that it was unable to comply with the terms of the Settlement Agreement because other Amazon terminated the Amazon Agreement.

216.    Josef and Gold prevented Plaintiffs from receiving the benefits under the MCA Agreement and Settlement Agreement by providing assistance with the financing of business operations.  Josef and Gold created agreements and repayment obligations that made it impossible for SDLA to perform and actually conduct business. Josef and Gold knowingly created these contracts with the intent that SDLA would fail to meet its obligations in order to extract as much money from the business as possible.

217.    By doing so, Josef and Gold acted in bad faith.

218.    Plaintiffs were harmed by Josef and Gold's conduct in an amount to be determined at trial.

## NINTH CAUSE OF ACTION

### Fraudulent Misrepresentation

(Against All Defendants)

219.    Plaintiffs repeat and reallege each and every paragraph of this Complaint as if fully set forth herein.

220.    Defendants presented to SDLA agreements which contained, within their language, intentional misrepresentations, including, but not limited to, the following: (1) statements that the arrangements were "sales" and "not loans"; (2) representations that payments did not constitute interest, when in fact, the rate was in excess of 200%; and (3) that Gold bore the risk of loss of a slowdown in SDLA's business operations.

221.    Defendants knew that the representations were false or made the representations recklessly and without regard for the truth.

222.    Plaintiffs reasonably relied on Defendants' representations and were induced to enter into the MCA Agreement and the Settlement Agreement by these fraudulent and deceitful representations.

223.    Plaintiffs were harmed in amounts and in a manner subject to proof at trial, including, but not limited to, all interest paid on the loans under the MCA Agreement and Settlement Agreement above the legally permissible rate represented by Defendants.

224.    Plaintiff's reliance on these representations was a substantial factor in causing its harm.

225.    Entering into these Agreements and the Defendants' unlawful collection practices caused Amazon to terminate its contract with SDLA.

## TENTH CAUSE OF ACTION

### Unjust Enrichment

(Against Gold CT and Gold NY)

226.    Plaintiffs repeat and reallege all of the paragraphs of this Complaint as though fully set forth herein.

227.    Gold CT and Gold NY were unjustly enriched when it received repayments in excess of amounts that would be permissible under California law, a benefit that it would not have otherwise obtained thought a legally compliant loan process.

228.    Gold CT and Gold NY have been unjustly enriched at Plaintiffs' expense in amounts subject to proof at trial.

///

///

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs seek judgment against the Defendants as follows:

A.      Direct damages according to proof at trial, estimated to be $15 Million Dollars;

B.      Compensatory, indirect, and consequential damages according to proof at trial;

C.      Treble damages under 18 U.S.C. § 1964(c);

D.      An order preventing and restraining Josef, Zach, and Daniel, and the members of MCA Receivables from engaging in the activities of the Enterprise and divesting all of their respective interests in Gold NY, Gold CT, and Ace under 18 U.S.C. § 1964 (a);

E.      Voiding the MCA Agreement pursuant to Cal. Rev. & Tax Code § 23304.1;

F.      Voiding the Settlement Agreement pursuant to Cal. Rev. & Tax Code § 23304.1;

G.      Punitive damages as allowed by law;

H.      Restitution;

I.      Attorneys' fees and cost, as permissible under law; and

I.      Such other and further relief as this case may require and the Court deems just and proper.


Date:   September 20, 2024                    **MIRSKY CORPORATE ADVISORS, APC**


                                              By: _/s/ Steven J. Mirsky_____

                                              Steven J. Mirsky, Esq.

                                              Attorney for Plaintiffs

**VERIFICATION**

I, John Goodman, declare as follows:

    1.  I am the acting Chief Executive Officer of SDLA Courier Service, Inc, a party to this action.

    2.  I have read the foregoing Complaint and know its contents.

    3.  I am authorized to make this verification for SDLA Courier Service, Inc. and make this verification for that reason.

    4.  The matters stated in the Complaint are true to my own knowledge, except as to matters which therein are stated upon information or belief, and, as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

**SDLA Courier Service, Inc.**

By: _John Goodman_

Name: John Goodman

Title:   CEO

Dated: September 19, 2024